NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Bankruptcy Case No. 07-11757 |
| SOLOMON DWEK, et al., | Chapter 11 |
| Debtor | |
| CHARLES A. STANZIALE, JR., as Chapter 11 Trustee of Solomon Dwek, | |
| Plaintiff, | |
| vs. | Adversary No. 09-1256 |
| MORRIS LEVY, | **MEMORANDUM OPINION** |
| Defendant. | Defendant's Motion for Summary Judgment - Document Number 27 |
| | Hearing Date: March 28, 2011 |

**APPEARANCES**

Attorneys for Plaintiff
Christopher S. Mayer, Esquire
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Attorney for Defendant
Donald W. Kiel, Esquire
John M. Marmora, Esquire
K&L Gates, LLC
One Newark Center, Tenth Floor
Newark, New Jersey 07102

On March 28, 2011, the Court took oral argument on defendant Morris Levy's motion for summary judgment. The Court has considered the moving papers, the Trustee's response filed March 14, 2011, the movants response filed March 23, 2011, and oral argument.

The genesis of this adversary proceeding is that in March 2003, Solomon Dwek created Berkeley Heights Gas, LLC ("BHG") in the hope of acquiring property that might then be leased to a third party to operate a drug store. On September 15, 2003, BHG entered into a Ground Lease with Walgreen Eastern Co., Inc. On March 24, 2004, BHG amended its Certificate of Formation to reflect that Morris Levy had a 50% interest. Also in March 2004, BHG purchased two adjacent lots in Berkeley Heights, NJ. BHG obtained a note and mortgage with First Savings Bank in order to finance the purchase. Both Levy and Dwek personally guaranteed the note. In April 2005, BHG refinanced with GMAC and paid off the mortgage to First Savings Bank. Two days later Levy transferred his 50% interest in BHG to Dwek in consideration for $1,096,770 of the loan proceeds, which was paid to him on May 2, 2005. The Trustee ultimately sold the property in August 2009 for $3,400,309.

The Court will first address the procedural issues. The Trustee's complaint is unclear on what transfer he seeks to avoid, but in his opposition states that he seeks to avoid two transfers: 1) the March 24, 2004 transfer of a 50% interest in BHG; and 2) the May 2, 2005 buyout of Levy's interest in BHG. At oral argument, Mr. Levy's counsel stated that he was no longer pursuing the argument that the 2004 transfer was time barred because in preparing for oral argument he noticed on the docket of the main bankruptcy case that the Court had entered a tolling order. While the Court commends Mr. Kiel for his thorough preparation and honesty, he misapprehends the import of the Court's equitable tolling order. Section 546(a)(1) provides that

an avoidance action must be commenced within "2 years after the entry of the order for relief[1]." 11 U.S.C. § 546(a)(1)(A). This bankruptcy case was commenced as an involuntary petition on February 9, 2007, and as the two-year deadline approached the Trustee sought a limited extension of the February 9, 2009[2] deadline. On February 2, 2009, this Court entered an order extending the time limitations in § 546 until February 9, 2010, but the extension was intended to apply only to causes of action that could not be filed prior to the expiration of the initial limitation period in § 546 due to "exceptional circumstances"[3]. It does not appear that this adversary proceeding would be subject to the tolling order[4] because Morris Levy would appear to have been a known transferee at the time the tolling order was entered (as demonstrated by the fact that the complaint against him was filed ten days later).

Nonetheless, the Court finds that this adversary proceeding is timely filed because § 546(a)(1) provides that an avoidance action must be commenced within "2 years after the entry of the order for relief" and the entry of the order for relief in this case was February 22, 2007, when the Court entered an order voluntarily converting the case to Chapter 11. *See*, 11 U.S.C. § 301(b) ("The commencement of a voluntary case under a chapter of this title constitutes an order

---

[1] No formal order for relief was entered in this case because the case converted to a voluntary Chapter 11.

[2] The Trustee mistakenly regarded the date of the filing of the involuntary as the date of the entry of the order for relief.

[3] The Trustee sought a tolling of the statute of limitations in § 546 because he thought there might be additional avoidance causes of action that he was unaware of due to his inability to depose Solomon Dwek or review documents in the possession of the FBI. In his application, the Trustee limited the relief he sought: "The Trustee proposes that as to the unknown defendants, creditors and potential transferees, that the Court equitably toll the statute for one (1) year."

[4] Trustee's counsel has not argued that the equitable tolling order applies here.

for relief under such chapter.").

A finding that the adversary proceeding was timely filed under § 546 does does not address the more specific issue of whether the 2004 transfer was a viable cause of action at the time the Trustee filed this adversary proceeding. At oral argument, the Trustee's counsel argued for the first time that the cause of action based on the 2004 transfer was timely based on the interpretation of the limitations periods in In re Bernstein, 259 B.R. 555 (Bankr. D.N.J. 2001). This Court concurs with the analysis in Bernstein and finds it to be an accurate reading of the Princeton-NewYork Investors trio of cases. The Bernstein case stands for two basic propositions: 1) "[t]here is no cause of action under Code section 544(b), and hence no extension under Code section 546(a) of the time to sue, if the creditor in whose place the trustee stands under Code section 544(b) had no right to sue on the petition date because the cause of action had expired by then"; and 2) if a trustee seeks to use the one-year tolling provision of N.J.S.A. 25:2-31(a), then there must be an actual creditor who "had the ability to institute an action under the UFTA as of the petition date." Bernstein, 259 B.R. at 559-60. The Trustee has not argued that the discovery rule applies here, so the Court is left to assume that the Trustee is relying on the first proposition. The question thus becomes whether the cause of action under the NJFTA was still viable on the petition date.

The statute of repose for fraudulent transfers actions under NJ law is four years from the date of the transfer or one year from the date of discovery. *N.J.S.A.* 25:2-31. *See*, First Union Nat'l Bank v. Gibbons (In re Princeton-NewYork Investors, Inc.), 219 B.R. 55 (D.N.J. 1988) (found that N.J.S.A. 25:2-31 was a statute of repose); *but see*, SASCO 1997 NI, LLC v. Zudkewich, 166 N.J. 579 (2001) (referring to N.J.S.A. 25:2-31 as a statute of limitations but not

analyzing the issue).  The transfer of the 50% interest in BHG occurred on March 24, 2004.  Thus a cause of action based on that transfer would be extinguished as of March 25, 2008.  So at the time the bankruptcy case was filed on February 9, 2007, the cause of action on the 2004 transfer was still viable.

The next procedural matter is that the Trustee argues that summary judgment should be denied or, alternatively, decision should be deferred because Levy has not yet produced documents essential to the Trustee's opposition.   The Third Circuit has interpreted Rule 56(f) as "imposing a requirement that a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained."  Dowling v. City of Philadelphia, 855 F.2d 136 (3d Cir. 1988).  The Trustee submitted the Rule 56(d) declaration of Stephanie Platzman-Diamant.  That declaration is deficient for two reasons.  First, the certification does not shed enough light on how the information sought might preclude summary judgment.  Second, and more importantly, the declaration fails to address the essential issue of why this information was not obtained previously.  Although the discovery deadline is mentioned in passing, the Trustee attaches no importance whatsoever to the fact that the current scheduling order in this case provides that all fact discovery is to be complete by October 1, 2010 and all motions to compel production of discovery were to be filed by September 1, 2010.  The original date for the end of discovery was April 1, 2010 but the parties, with the Court's permission, have extended those deadlines three times.  When it became apparent months ago that the Trustee believed he did not have all the relevant discovery, it was incumbent upon him to seek an extension of the fact discovery

deadline from the Court. While the Court appreciates that the parties where trying to settle the discovery dispute without Court intervention, that would explain the lack of a formal motion to compel discovery; it does not explain the failure to seek the Court's permission to continue to conduct discovery past the October 1, 2010 deadline. Therefore, the request for a delay pursuant to Rule 56(f) is denied.

The Trustee also asserts that the Court should not consider Levy's good faith transferee defense because he failed to plead the affirmative defense in his answer to the Amended Complaint. The Trustee is not in strong position here given that he has chosen not to correct his <u>verified</u> complaint (verified by Solomon Dwek on 11/5/09) in light of the fact that Solomon Dwek negated many of the those verified "facts" at his deposition and in his affidavit in opposition to this motion. For example, at ¶ 20 of the Amended Complaint the Trustee states that "Shortly after the lease began, Levy approached Dwek, told Dwek that he needed cash, and demanded that Dwek purchase his share in Berkeley Gas." That verified "fact" is directly contradicted by Solomon Dwek's deposition testimony on June 22, 2010 in which he stated that it was his decision to buy out Morris Levy's interest in Berkeley Gas. *Dwek Dep. 179:24-180:19 [Marmora Supp. Cert., Ex. A]*. In Mr. Dwek's own words he said did not want to sell BHG to a third party because "I was greedy and I wanted to own the property." *Dwek Dep. 180:18-19 [Marmora Supp. Cert., Ex. A]*

Another example is that in ¶ 15 of the Amended Complaint it states that "Dwek reluctantly agreed to <u>give</u> Levy a share in Berkeley Gas." (emphasis added) Similarly in ¶ 16 it states that "Dwek amended the Certificate of Formation for Berkeley Gas to <u>give</u> Levy a 50% share in the LLC." (emphasis added) Then in ¶ 24 it states Levy pocketed a significant profit

despite "putting up almost no money to become a member of Berkeley Gas." None of those verified statements have ever been corrected despite the fact that the Trustee now admits that Levy made a contribution for his interest in Berkeley Gas. "There is no dispute that Levy transferred *some* value in exchange for Dwek's fraudulent transfers in the form of his initial contribution to BHG." *Trustee Brief In Opposition to summary judgment* at 21 n. 4. In actuality, the undisputed facts establish that Levy's capital contribution in BHG was exactly the same as Dwek's - $238,182 - and Levy and Dwek both personally guaranteed BHG's mortgage note to Bank Savings Bank. *See*, *Dwek Deposition* 68:14; Dwek correspondence to Levy dated April 2, 2004. So if the Trustee really asks the Court to be hyper-technical about pleadings, the Court should disregard all of the factual allegations in the verified complaint.

On a practical level, the Court does not agree with the characterization of the good faith transferee defense as an affirmative defense. Unlike the affirmative defenses listed in Fed. R. Civ. Pro. 8(c)(1), this is a statutory defense under both § 548(c) and N.J.S.A. 25:2-30(d). Even assuming "good faith transferee" is an affirmative defense that needs to be pled in an answer, waiver is not mandatory. "[A] court may in its discretion consider an untimely assertion of an affirmative defense where delay appears not to have been for tactical or other improper reasons, or 'most important,' where delay did not prejudice the plaintiff's case." McCoy v. Board of Trustees of the Laborers' In'l Local, 188 F. Supp. 2d 461 (D.N.J. 2002). The Court would be hard pressed to find that the Trustee would be prejudiced in defending against a defense that is part of the statute he pled in his complaint. There is certainly no element of surprise. There is also no evidence that this defense has been asserted for an improper purpose, therefore, the Court finds that the defense has not been waived.

7

The Court now turns to the merits of the motion. The Federal Rules provide that summary judgment should be granted only when the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. Pro.* 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Third Circuit has stated that whenever there is even the "slightest doubt regarding the facts of a case, summary judgment should not be granted." Tomalewski v. State Farm Life Ins, Co., 494 F.2d 882, 884 (3d Cir. 1984). Facts must be viewed in the light most favorable to the party against whom summary judgment is sought. Tran v. Metropolitan Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005).

**A. Actual fraud**

Count I of the Amended Complaint asserts a cause of action pursuant to § 548(a)(1)(A). That section provides that:

> The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted

11 U.S.C. § 548(a)(1)(A). The trustee has the burden of proving an actual fraudulent transfer under § 548. Frierdich v. Mottaz, 294 F.3d 864, 867 (7th Cir.2002). Count II of the Amended Complaint pleads actual fraud under N.J.S.A. 25:2-25(a). The elements for both causes of action are the same; the Trustee must establish: 1) a transfer of an interest of the debtor; 2) with actual intent to hinder, delay, or defraud creditors. Forman v. Salzano (In re Novergence, Inc.), 405 B.R. 709 (Bankr. D.N.J. 2009).

8

The first question the Court must address is which debtor made these transfers. The Trustee asserts that it was Solomon Dwek, while Levy asserts that it was BHG. The analysis of that issue differs for the two transfers. The Trustee urges the Court to consider these two transactions as one unified transfer for purposes of the fraudulent transfer analysis. The Court is not persuaded by the Trustee's collapsing or integrated transaction theories. Levy's initial acquisition of an interest in BHG and the subsequent redemption of his shares were not an integrated transaction. *See*, In re Plassein Int'l Corp., 388 B.R. 46 (Bankr. D. Del. 2008). The transactions are not interdependent; at the time Levy obtained his shares, BHG was not obligated to redeem Levy's interest. The cases cited by the Trustee involve starkly different fact patterns.

**1) 2004 transfer of 50% interest in BHG**

It is undisputed that BHG was formed for the purpose of acquiring certain properties and leasing the assemblage to a third party. The Trustee describes BHG as "the company Dwek used to develop and negotiate the deal with Walgreens." *Trustee opposition brief* at 2. At the time of BHG's formation on March 7, 2003, Solomon Dwek was the sole member. When the sole shareholder of a corporation decides to transfer 50% of those shares to another entity, that is a transfer from the individual shareholder. So in this case the Court must view the first transfer as being from Dwek to Levy.

If Dwek is the relevant debtor for this transaction the Court must examine his intent regarding the transfer. Dwek stated the he "made the transfer to Levy with the intent to delay, hinder, and defraud my creditors, including the Adjmi family." *Declaration of Solomon Dwek in Opposition to Summary Judgment* at ¶ 30. The Trustee has cited cases for the proposition that in the rare instance where there is direct evidence of a debtor's intent to defraud there is no need to resort to circumstantial evidence. *See, e.g.,* In re Seitz, 400 B.R. 707, 713 (Bankr. E.D. Mo.

9

2008). That is true; but, that does not mean that a court or creditors must blindly accept a debtor's statement regarding his own intent. The Seitz court certainly did not blindly accept the debtor's statement. After acknowledging that the "case appears to be one of those rare instances in which there is direct evidence of the debtor's intent to defraud", the Seitz court went on to examine several other theories that might have refuted the debtor's statement regarding his own intent.

In this case, a probe of Dwek's statement regarding his intent raises more questions. The Trustee's initial theory of the case was that Levy assisted "Dwek by convincing his uncles to provide financing for Dwek's various business schemes. Levy assured his uncles that Dwek's business ventures were legitimate. In exchange for this assistance, Levy demanded a share of Berkeley Gas." *Verified Amended Complaint* at ¶ 13, 14. The current theory on why Dwek transferred the shares of BHG is that it was hush money. Dwek claims that when Levy took over the operation of Site Managment he began poking around and noticed some anomalies with regard to Dwek's investments with the Adjmi family. Dwek now claims that "[t]his made it apparent to me that I had to find a way to bribe him or my frauds would be exposed to Mark Adjmi, other members of the Adjmi family, and the business community in general." *Declaration of Solomon Dwek in Opposition to Summary Judgment* at ¶ 13. Dwek goes on to certify that "[t]o buy Levy's silence, I decided to offer him a share of a surefire investment deal to develop properties in Berkeley Heights, New Jersey, including an old Exxon-Mobil gas station." *Declaration of Solomon Dwek in Opposition to Summary Judgment* at ¶ 14. This new theory is incongruent with some of the documented facts. For example, in his April 2, 2004 letter to Levy, Solomon Dwek acknowledges receipt of an investment of $216,000 from Levy, but states that "the total cash into the deal, per partner is $238,182.53" and asks Levy to forward

10

an additional $22,182.53. *Marmora cert.* Ex. Y. If "giving" Levy a 50% interest in BHG was intended to be a bribe to buy Levy's silence, why would Dwek then nickel and dime Levy for $22,000; in fact, why would Dwek require a capital contribution from Levy at all? In a similar vein, why would Dwek resist selling the Berkeley Heights property, as he claims, when Levy was eager to sell it. If the bribe theory were to hold any water, it would seem logical that Dwek would have wanted to keep Levy happy and allow him to realize a profit from the sale of the property rather than be an impediment to such a sale. Ultimately, there are too many questions regarding Dwek's alleged intent to enter summary judgment on Counts I and II.

If the Trustee is not able to prove actual intent directly, then the Court would look to circumstantial evidence of fraud. To undertake that analysis the Court would need to know the value of BHG as of March 24, 2004, when the transfer occurred. There is no evidence that BHG had any significant tangible assets[5] prior to its closing on the two adjacent lots in Berkeley Heights on March 30, 2004. BHG appears to have been founded as a shell corporation and then negotiated some inchoate deals, most importantly, the lease with Walgreens. The final piece of the puzzle for the Walgreens lease to be finalized was the acquisition of the Berkeley Heights properties, and that did not occur until after Levy had a 50% interest in BHG. If the purchase of those properties had fallen through, for whatever reason, the value of BHG arguably would be zero. The Trustee submits an appraisal of the Berkeley Heights properties obtained by the proposed mortgagor First State Bank. *Dwek Dep.*, Ex. P. The appraiser places a value on 343 Springfield Ave. and 75 Snyder Ave. in Berkeley Heights of $2.4 million. An essential assumption underlying that valuation was that the ground lease with Walgreens would be

---

[5]The only assets listed in BHG's bankruptcy petition are the real property in Berkeley Heights, an account receivable for rent from Walgreens, and a bank account with a *de minimus* balance.

finalized. For the purposes of this motion, it is important to note that the appraisal was of the real property with a finalized lease, it was not an appraisal of BHG - a corporation with two inchoate contracts.

### 2) 2005 redemption of Levy's interest in BHG

The same threshold issue exists with regard to the transfer of Levy's interest in BHG, that is, which debtor was the transferor. The undisputed facts establish that the funds used to redeem Levy's interest in BHG came from a refinance of BHG's mortgage loan. The sole obligor on the new mortgage note is BHG, not Solomon Dwek. Solomon Dwek did not even guarantee the loan; in fact, the refinance eliminated the personal guaranty he had of the First Savings Bank loan. While the intent of the transaction may have been for Solomon Dwek, personally, to buyout the interest of Levy, the mechanics of the transactions were that BHG obtained a mortgage loan and a portion of the proceeds of that loan were later transferred to Levy. BHG signed a promissory note and mortgage on April 26, 2005, and then two days later on April 28th Morris Levy assigned his 50% interest in BHG to Solomon Dwek in consideration of $1,096,770, which was paid from BHG's loan proceeds on May 2, 2005. There was never a transfer from Dwek to Levy; only a transfer from BHG to Levy. It is immaterial to the analysis that Dwek perceived himself as one in the same as BHG. *See*, PayPhone LLC v. Brooks Fiber Commc'ns., 126 F. Supp. 2d 175, 179 (D.R.I. 2001) ("[A] corporation may not pierce its own corporate veil for its own benefit."). Similarly, the fact that the transfer resulted in Dwek becoming the sole remaining shareholder of BHG also does not mean that Dwek and BHG are one in the same. The corporate form cannot be disregarded without a formal request to pierce the corporate veil. That did not happen here.

Once it is established that BHG and not Dwek is the relevant debtor the argument that

Dwek harbored an actual intent to hinder or defraud creditors becomes immaterial. Based on the record before the Court, it is impossible to conclude that BHG harbored an actual intent to defraud its creditors. BHG had only two relevant creditors: First Savings Bank and GMAC.[6] First Savings Bank was paid in full in connection with the transfer at issue so no possible fraud as to it can be established. There are also no allegations that GMAC, a sophisticated commercial actor, was deceived as to any aspect of the refinance. GMAC presumably conducted its own investigation into the commercial viability of this transaction. No reasonable trier of fact could conclude that the Trustee has established that BHG intended to defraud GMAC by entering into the refinance. Dwek stated in his June 22, 2010 deposition that in his opinion the property was worth approximately a million dollars more than GMAC's mortgage. *Dwek Dep.* at 152.

## B. Constructive fraud

Even if the Court were to look to circumstantial evidence of fraudulent intent, it is woefully lacking here. Typically, when direct evidence of fraudulent intent is insufficient, courts look to the badges of fraud. In re Image Masters, Inc., 421 B.R. 164 (Bankr. E.D. Pa. 2009). These are the same badges of fraud that are relevant under the NJ Fraudulent Transfer Statute. In this case, the confluence of those badges do not establish fraud. These factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the

---

[6] When Solomon Dwek was asked at his June 22, 2010 deposition if BHG had any debt other than the first mortgage, he responded: "Maybe nominal. Maybe an insurance company or something like that that we owed money to, but nothing specific." *Dwek Dep.* at 151:12-16.

Debtor received inadequate consideration for the transfer. In re Retz, 606 F.3d 1189, 1200 (9th Cir. 2010). The most relevant factor to this analysis is whether BHG[7] received inadequate consideration for the transfer. The Trustee describes this as the most crucial badge of fraud. Russo v. McLaughlin (In re McLaughlin), 2006 WL 3796421 (D.N.J. Dec. 20, 2006). The entirety of the Trustee's argument that there was not reasonably equivalent value is focused on value to Solomon Dwek as a result of the initial transfer of an interest in BHG. *See*, *Trustee Brief in Opposition* p. 14 -17. The Trustee fails to address the most basic issue here: what was the value of BGH at the time Levy redeemed his shares. The sole asset of BHG was the real estate and the lease of that real estate to Walgreens. It cannot be disputed that in 2005 when this transfer occurred the real estate market in New Jersey was what Dwek described as "hot". Even in a depressed real estate market in 2009, the Trustee sold the sole asset of this LLC for $3.4 million. Levy has produced evidence of a third party offer for the property from Roebling Investment Company for $4,101.639. *Marmora Cert.* Ex. BB. This offer formed the basis of the parties' calculation of the buyout price for Levy's shares. On this record, the Court finds that summary judgment is appropriate on the constructive fraud counts (for the 2005 redemption) because no rationale trier of fact could conclude that using a current, arms-length offer to value the property resulted in BHG receiving less than reasonably equivalent value.

Conclusion

Summary Judgment is denied on Counts I and II. Partial summary judgment is granted

---

[7]Even if the Court were to accept the Trustee's argument that Solomon Dwek was the relevant debtor, it is far from clear that Dwek did not receive reasonably equivalent value. As a result of the GMAC refinance, Dwek became the 100% owner of the shares of BHG and the entity itself was no longer liable on a recourse basis. Solomon Dwek's personal guaranty was also extinguished. The Trustee sold the property in August 2009 for $3,400,309.

on Counts III and IV as they pertain to the 2005 transfer. The Trustee has withdrawn Count V (deepening insolvency). Defendant's counsel should submit a form of order in accordance with this opinion.

                                             */s/ **Kathryn C. Ferguson***  
                                             KATHRYN C. FERGUSON  
                                             US Bankruptcy Judge

Dated: April 4, 2011